**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION**

| | |
|---|---|
| CONNIE JO MORRIS and JOHNNY MORRIS, | |
| PLAINTIFFS, | |
| v. | CIVIL ACTION FILE NO.: 5:20-cv-00032-LGW-BWC |
| WAL-MART STORES EAST, LP; WAL-MART STORES EAST, LP, D/B/A WAL-MART SUPERCENTER #593; WALMART INC F/K/A WAL-MART STORES, INC., | |
| DEFENDANTS. | |

## DEFENDANTS' DAUBERT MOTION TO EXCLUDE TESTIMONY OF JEFFREY GROSS AND BRIEF IN SUPPORT THEREOF

Defendants respectfully move this Court for an Order excluding the testimony of Plaintiffs' purported premises expert, Jeffrey Gross, pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and respectfully show this Court as follows:

## I.     STATEMENT OF FACTS

### A.     Connie Jo Morris's Fall

This is a straightforward premises liability case which arises out of a trip and fall in the parking lot of Walmart Store Number 593 in Douglas, Georgia. On the afternoon of February 6, 2018, Plaintiff Connie Jo Morris went grocery shopping at Walmart Store Number 593 located at 1450 Bowens Mill Road S.E., Douglas, Georgia 31533. (Deposition of Connie Jo Morris, Doc. 26-1 at 18:6-14). Mrs. Morris parked her car, went inside Walmart to complete her grocery shopping, came back to her car to unload her groceries, and then went to return her shopping cart

to the closest cart corral. (*Id.*) Rather than simply push her cart inside the corral, Mrs. Morris walked all the way inside of the cart corral and successfully traversed the metal base plate at the entrance of the corral to return her shopping cart. (*Id.* at 25:11-13; 26:4-8).

Mrs. Morris had no difficulty getting her shopping cart over the metal base plate and inside of the cart corral. (*Id.* at 25: 15-17). She likewise did not notice any bumps or catching sounds when pushing her cart over the metal base plate. (*Id.* at 25: 19-23). During her deposition, Mrs. Morris testified that she entered the corral and fell while exiting the corral **just seconds later**. (*Id.* at 26: 4-8; 42: 8-11). She was not looking down at the ground as she was exiting the cart corral but was instead looking straight ahead. (*Id.* at 39: 1-4). The only difference between how Mrs. Morris walked into the cart corral, and how she walked out of the corral, was that she had a shopping cart with her as she entered the corral. (*Id.* at 26: 10-14).

When asked what, specifically, caused her fall, Mrs. Morris testified "I think my boot hung on that piece of metal that sticks up." (*Id.* at 35: 13-16). She then clarified her response by stating that the metal base plate was "not flush with the pavement." (*Id.* at 35: 19-21). Mrs. Morris also criticized the base plate for being "the same color as the pavement," but when asked what the color of the base plate had to do with her fall, she testified "I would just think that it would be more specific looking. There was nothing specific to tell me that there was a raised area there." (*Id.* at 36:22 – 37:3). That said, it is undisputed that Mrs. Morris knew the base plate was there. (*Id.* at 28:18 – 29:2; 29:24-16; 30:10-11).

**B.**   **Plaintiffs' Purported Premises Expert – Jeffrey Gross**

The very purpose of Georgia's *Daubert* framework is to guard against "junk science" – hired gun opinions lacking reliability and helpfulness. Whether you look to Mr. Gross's lack of knowledge, *ipse dixit*, or his remarks to "argue [a particular issue] with the judge," Jeffrey

Gross's opinions are not beyond the ken of the average layperson and fall far short of being the product of a reliable and sound methodology. These are precisely the types of opinions that *Daubert* forbids.

### 1. *Mr. Gross's expert retention*

Plaintiffs retained Jeffrey Gross on March 28, 2018 – a little less than two months after Mrs. Morris's fall. (Deposition of Jeffrey Gross, Doc. 26-2 at 24: 9-13). Mr. Gross made it clear in both his "Rule 27"[1] Report and deposition testimony that he was not retained to testify about "causation, negligence, duty of care, visual acuity, human factors, and/or the behavior of the plaintiff in this case in any way." (*Id.* at 73:11 – 74:3; *see also* Doc. 26-8 at JGross_000036). Rather, Mr. Gross intends to offer trial testimony on "codes and standards that inform one about what a trip hazard is, what is admissible[2], what is not in that - - that condition existed in the area represented to [him] by plaintiff's counsel where the plaintiff fell, and that it's a trip hazard." (Doc. 26-2 at 73:11 – 74:3).

Specifically, Mr. Gross was retained by Plaintiffs' counsel to review photographs of the metal base plate which were taken by either Plaintiff Johnny Morris, or Plaintiffs' counsel, and to then offer an opinion on whether he believed the base plate amounted to a "hazardous condition." (*Id.* at 74: 1-12). Importantly, however, Mr. Gross had no knowledge as to **when** the photographs of the base plate he reviewed were taken.  (*Id.* at 82: 7-12). The date of the photographs is critical, as Mr. Gross conceded that over time, the base plate can look differently than it looked on the day of Mrs. Morris's fall. (*Id.* at 87: 14-18). Even more concerning,

---

[1]     The first page of Mr. Gross's expert report notes that it was prepared "in compliance with Rule 27 requirements." Presumably, that was a typo. (Doc. 26-8 at JGross_000036).

[2]     There should be no dispute that Mr. Gross, as a retained premises expert, can certainly not step into the role of Judge and make admissibility determinations at trial.

perhaps, is the fact that Mr. Gross could not even verify if the photographs he based his opinions on were taken in the same Walmart parking lot where Mrs. Morris fell[3]. Instead, Mr. Gross just took Plaintiffs' counsel's representations of the photographs at "face value." (*Id*. at 87:16 – 88:9).  Mr. Gross had over two years to physically inspect, measure, and photograph the metal base plate at issue, but chose not to do so as he was "comfortable with the photographs and other information [that he] ha[d]." (*Id*. at 167:23 – 168:13).

The date and location of the photographs he relied upon to form his opinions and the stock and thickness of the base plate at issue are not the only pieces of information Mr. Gross was missing. Although one of the four opinions Mr. Gross offered in this case is "[b]ased on discovery information received to date, no information has been provided which indicates that Walmart conducted any routine safety inspection of the . . . Cart Corral to identify potentially hazardous conditions . . .," Mr. Gross conceded that he had not reviewed or received **any** discovery in this case including Walmart's discovery responses, document production, or deposition testimony. (*See* Expert Report, Opinion 2; Doc. 26-8 at JGross_000038; *see also* Doc. 26-2 at 14:16-19, 15:24 – 16:24, 131:18 – 132:8). He likewise testified that he has never spoken with any Walmart employee about how or whether they performed inspections of their shopping cart corrals prior to Mrs. Morris's fall. (Doc. 26-2 at 133: 5-7).

### 2. *Jeffrey Gross's opinions*

Mr. Gross has four main opinions he intends to offer in this case. The first "opinion" is not an opinion at all, but rather a recitation of quotes from the National Cart Company Safe Use and Maintenance Guide for Cart Corrals. (Doc. 26-8 at JGross_000037-38; *See also* National

---

[3]      Mr. Gross even acknowledged that several of the metal base plate photographs included with his expert report were taken at **other** Walmart locations and of course depict base plates with no relevance to the instant litigation. (Doc. 26-2 at 89:16 – 90:17).

4

Cart Co. Safe Use & Maintenance Guide; Exhibit "A"). Mr. Gross's "opinion" as to the National

Cart Company Safe Use and Maintenance Guide is as follows:

> The National Cart Corral Company (National Cart) publishes a "Safe use and maintenance Guide for Cart Corrals. This document was revised on May 2015. On Page 3 of this document under the heading Safety Inspection Checklist, National Cart states as part of its checklist "corral sits flush on the ground and is firmly anchored to the parking lot." And "[t]here are no bent, cracked, sharp or protruding areas on the cart corral that may cause injury."

(Doc. 26-8 at JGross_000037-38).

Second, Mr. Gross opined that "based on discovery information received to date" (despite

conceding he had not received any discovery exchanged in this case), he did not see any

evidence to suggest that Walmart conducted routine safety inspections of their cart corrals

"consistent with the manufacturer's directions and guidance for conducting safety inspections."

(*Id*. at JGross_000038). Mr. Gross expanded on this opinion during his deposition and essentially

testified that because he has not seen evidence that Walmart conducted inspections of the cart

corrals consistent with the manufacturer's maintenance guide, it therefore follows that no

inspections were conducted. (Doc. 26-2 at 1132: 15-20). Further, Mr. Gross intends to

"extrapolate out . . .potential consequences to the safety of the pedestrian [and] the customer" of

Walmart's purported failure to conduct inspections of their exterior cart corrals and metal base

plates. (*Id*. at 153: 14-21).

Mr. Gross's third opinion is that "[h]ad Walmart conducted inspections consistent

with the directions and guidance from the manufacturer, National Cart, more likely than

not Walmart would have found the defective and potentially hazardous condition which

created a trip hazard." (*Id*.) Mr. Gross based his third opinion on the following:

> the photographs taken which accurately depict the condition of the cart corral; the cart corral manufacturer's direction and guidance for conducting an inspection of

the cart corrals; and the standards derived from the American Society of Testing and Materials "ASTM" Standard Practice for Safe Walking Surfaces F1637-13.

(Doc. 26-8 at JGross_000038).

Mr. Gross further testified that the existence of photographs showing other damaged cart corrals "**presumably**" at the same Walmart where Mrs. Morris fell amounts to "evidence that nobody is looking at the cart corrals." (Doc. 26-2 at 135: 4-14) (emphasis added). Additionally, Mr. Gross opined that photographs of other damaged cart corrals (with no confirmation as to the date that they were taken or whether they were even taken in the same parking lot as Mrs. Morris's fall) reveal a "conscious" and "systemic disregard throughout the property to do an inspection" and he assumed that if Walmart's employees were not doing inspections of the other cart corrals, they must not have inspected the corral where Mrs. Morris fell. (*Id*. at 136: 11-16).

Mr. Gross's fourth and final opinion is "[t]he condition of the base plate, as photographed . . . is a trip hazard" and that it was "damaged in such a fashion as to cause it not to be able to sit flush upon the surface of the parking lot." (Doc. 26-8 at JGross_000036, 38). Specifically, Mr. Gross opined that:

- The metal base plate is 1/4 inch thick;

- The space between the bottom of the metal base plate and the surface of the pavement is 3/8th of an inch;

- The total height from the surface of the parking lot to the top of the metal base plate is 5/8 inch; and

- His measurements "should be considered accurate to within 1/32nd of an inch."

(Doc. 26-8 at JGross_000037).

Mr. Gross based his opinion about the metal base plate constituting a trip hazard on the following: (1) his "40 plus years of experience in safety, security and loss prevention" and familiarity with walking surface trip hazards from his time working for Marriott; (2) the National

Fire Prevention Association Means of Egress Section; (3) the International Building Code with Georgia Amendments Means of Egress Section; (4) the Georgia American with Disabilities Act; and (5) "the reading of a ruler as well as addition and subtraction math." (*Id*. at JGross_000038). Mr. Gross further opined that sources one through four, above, "recognize that abrupt changes in the elevation of walking surfaces which exceed 1/4 of an inch are not permissible and must be treated in a fashion that allows it to be beveled to a geometry of 1 and 2 rise and run. (*Id*.) According to Mr. Gross "if one accepts the fact . . . that going into a car[t] corral is a foreseeable pedestrian path, then anything that can affect the pedestrian, such as a trip hazard, should be addressed[.]" (Doc. 26-2 at 145: 14-18).

### 3. *Methodology*

The methodology employed by Mr. Gross to determine the height of the bottom of the metal base plate from the pavement below involved "photographing while measuring with a ruler and adding an inch overlay in the picture which more clearly depicts the  measurements," as shown in the photograph below[4]:



---

[4]     The full-size version of this photograph that Mr. Gross used to add his inch overlay demonstrative to can be found at Doc. 26-5 at p. 10. *See also* Doc. 26-2 at 102:23 – 103:5.

(Doc. 26-8 at JGross_000037). Importantly, however, Mr. Gross testified that it was not him performing this methodology of photographing and measuring the base plate:

> **Q:** Now, this methodology, as far as the photographing, that wouldn't be your methodology. That would be the methodology of the person who took the photographs in this case; correct?
>
> **A:** In part, that is true. I would have taken the same photograph. I would have used a ruler. I would have used an overlay. If not on the scene, then on the ruler to more clearly depict the measurements. **Essentially, the methodology here is using a ruler**.
>
> **Q:** Okay. And again, somebody else, not you, using that ruler in this case; correct?
>
> **A:** That - - that's correct.

(Doc. 26-2 at 119:24 – 120:11) (emphasis added). Mr. Gross does not know **who**, took the photograph he used to add his inch overlay, when it was taken, or whether it was, indeed, the same base plate that allegedly caused Mrs. Morris to fall. (*Id*. at 87:7 – 88:9; 92:21 – 93:1).

Further, how Mr. Gross determined that the metal base plate at issue was 1/4 inches thick can be seen as nothing more than an "educated guess." Mr. Gross testified that 1/4 inches is consistent with his "prior experience in other cart corral examinations and in another cart corral by National that [he] was involved in" and that he had "never seen any evidence to the contrary from National Cart Corral" that the base plate at issue is **not** a quarter inch thick. (*Id*. at 120:12-22)[5]. Mr. Gross never conducted an in-person inspection of the metal base plate to put his own eyes on the base plate in relation to the pavement (as opposed to simply viewing it from the angle shown in photographs) before concluding it was a trip hazard, nor did Mr. Gross conduct

---

[5]     This argument, also known as the "appeal to ignorance fallacy," improperly assumes that the absence of evidence is taken to mean evidence of absence, when the burden of proof always lies with the person making a claim. *See* Ali Almossawi, *An Illustrated Book of Bad Arguments*, p. 26 (2013).

his own measurements or even attempt to determine the accuracy of his assumptions. (*Id*. at 80:3 – 82:6).

When asked about "parallax error"—which occurs when measurements of an object's length are more or less than the true length because one's eye being positioned at an angle to the measurement markings—Mr. Gross testified that he did not account for it in this case because he did not believe it occurred and did not see any "evidence whatsoever to show that it occur[ed] to any significant degree that would cause the photograph to be not a true and accurate representation of the condition." (*Id*. at 109:11 -110:15). Mr. Gross further opined that based on the photograph of the base plate (taken on an unknown date by an unknown individual and having no independent knowledge that the photograph did, indeed, reflect the base plate at issue) with the inch overlay he added to the photograph, he believed "his" measurements were accurate "to within a hundredth of an inch, **maybe**." (*Id*. at 110: 22-24) (emphasis added). Additionally, while conceding that the thickness of the ruler used to measure the baseplate "theoretically could" impact his reported measurements of the base plate, Mr. Gross testified that he did not know  how thick the ruler that was used was and instead just assumed that it was "somewhere around an eighth of an inch." (*Id*. at 110:25 – 113:8).

## II.    ARGUMENT AND CITATION TO AUTHORITY

### A.    <u>Standard for Admissibility of Expert Testimony</u>

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)    the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)    the testimony is based on sufficient facts or data;

(c)     the testimony is the product of reliable principles and methods; and

(d)     the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Condensed, Rule 702 can be organized into three broad requirements: "qualifications[6]," "reliability," and "helpfulness." *See United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (*en banc*). The party offering the expert testimony has the burden of establishing that these three requirements have been met. *See id.*

The district court is tasked with assessing "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993). While courts have "considerable leeway" in determining which tests or factors to employ, in *Daubert*, the United States Supreme Court suggested that a trial court consider: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Id*. at 593-95.

When confronted with non-scientific testimony, however, *Daubert's* four factors are generally inapplicable. *See Kumho Tire Co. Ltd. V. Carmichael*, 526 U.S. 137, 152 (1999). As a result, the Advisory Committee Notes for Rule 702 provide the following guidance for other factors to consider when assessing the admissibility of non-scientific testimony:

---

[6]     Walmart does not concede that Mr. Gross is qualified to render opinions in this case as he has no experience related to safety in a **retail** setting (outside of being a "hired gun" expert) (Doc. 26-2 at 54: 14-22) (conceding he has never provided safety or loss prevention services in a purely retail setting similar to Walmart and acknowledging that it has been 20 years since last working in loss prevention for Marriott.)

(1)     Whether [the expert] is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the litigation, or whether [he has] developed [his] opinion expressly for purposes of testifying;

(2)     Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;

(3)     Whether the expert has adequately accounted for obvious alternative explanations;

(4)     Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting; and

(5)     Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

Fed. R. Evid. 702 advisory committee's notes (citations and internal quotations omitted); *See also 325 Goodrich Ave., LLC*, 891 F.Supp.2d at 1379.

Importantly, while *Daubert* does not require certainty, it does require reliability. *Hendrix ex rel. G.P. v. Enflo Co.*, 609 F.3d 1183, 1198, n.10 (11th Cir. 2010). As for the "helpfulness" requirement, Rule 702 requires that the evidence or testimony help "the trier of fact to understand the evidence or determine a fact in issue." *Daubert*, 509 U.S. at 591. The "helpfulness" requirement is two-fold – expert testimony must be relevant to an issue in the case and is considered helpful "if it concerns matters that are beyond the understanding of the average lay person." *Frazier*, 387 F.2d at 1262. "[E]xpert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id*. at 1262-63. Further, expert testimony which involves a "large analytical leap" between the facts and the opinions reached is not considered to be helpful. *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004).

*Daubert's* burdens are in place for a reason: the dangers of an unreliable expert witness, testifying as to unreliable and/or unsupported opinions which are the product of unsound

methodology. "[T]he expert's opinion 'can be both powerful and quite misleading because of the difficulty in evaluating it.'" *Frazier*, 387 F.2d at 1260 (quoting *Daubert*, 509 U.S. at 595). Therefore, the "[t]he importance of *Daubert's* gatekeeping requirement cannot be overstated." *Id*. The Court must "keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311-12 (11th Cir. 1999).

    **B.**    <u>**Mr. Gross's Opinions are Speculative, Based on Nonexistent Facts and Data,**</u>
              <u>**and Will Not Assist the Trier of Fact**</u>

        Expert testimony will be excluded and deemed unhelpful when "it is not needed to clarify facts and issues of common understanding which jurors are able to comprehend for themselves." *Hibiscus Assoc. Ltd. V. Bd. of Trustees of Policemen and Firemen Retirement Sys. of City of Detroit*, 50 F.3d 908, 817 (11th Cir. 1995) (citations omitted). Similarly, neither the *Daubert* factors nor the Federal Rules of Evidence "require a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). A court may conclude that there is "simply too great an analytical gap between the data and the opinion offered." *Id*. The trial court's gatekeeper role under *Daubert* ensures that speculative and unreliable testimony does not reach the jury. *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).

        In *Abrams v. Walt Disney World*, 370 F.Supp. 2d 1221 (M.D. Fla. 2005), the plaintiff sought to recover for injuries after tripping on a post along the walkway of Defendant's theme park. *Id*. at 1222. Plaintiff's proffered safety expert opined that the post, which protruded into the walkway, was an unnecessary obstruction which was *per se* unsafe. *Id*. at 1224-25. In excluding the expert's opinions, the Court noted that questions of whether the post protruded into or obstructed the walkway, and whether the obstruction was considered unsafe, were "commonly

known and observable matters" well within the jury's ken. *Id.* at 1225-26. Similarly, in *Pleasant v. Neesmith Timber Co. Inc.*, No. 408CV192, 2010 WL 2697109, at *3 (S.D. Ga. July 7, 2010), the Court excluded the testimony of Plaintiff's purported "trucking safety expert" who intended to testify that the truck driver should have seen the plaintiff pedestrian approaching and that Defendant's truck was more likely than not the truck involved in the accident. The Court emphasized that these opinions did not require any specialized knowledge or unnecessarily stated legal or factual conclusions which the jury could determine without the expert's assistance. *Id.*

1.   ***Opinion 1: National Cart Company Safe Use and Maintenance Guide for Cart Corrals***

As a threshold matter, the National Cart Company Safe Use and Maintenance Guide is inadmissible as it has never been properly authenticated under Fed. R. Evid. 901 and does not qualify as evidence that is self-authenticating under Fed. R. Evid. 902. Setting the inadmissibility portion aside, Mr. Gross's first opinion amounts to nothing more than an acknowledgement of the existence of a manufacturer's recommendations for safe use and maintenance of its cart corrals and a word-for-word recitation from portions of these recommendations. (*See* JGross_000037-38; *See also* Ex. A). In fact, when asked whether a jury could simply read this maintenance guide and see for themselves what it says, Mr. Gross merely testified "**It's possible. Argue with the judge**." (Doc. 26-2 at 129:15 – 130:4) (emphasis added).  Mr. Gross then tried to justify his opinion by confusingly implying that a jury may not understand or "appreciate the importance" of the manufacturer's guide. (*Id.* at 130: 5-25).  However, when confronted with the fact that his opinion offers no explanation as to the "importance" or any other aspect of the guide, he testified "**[t]hat's . . . absolutely right**." (*Id.* at 131: 2-7) (emphasis added).  It should go without saying that jurors can read a document as simple as a manufacturer's

recommendations for using a cart corral, and understand that document, without Mr. Gross's assistance[7].

###    2.    *Opinion 2: Walmart's inspection procedures*

Mr. Gross opined that because he has not been provided with anything that indicates Walmart conducted inspections of their corrals, inspections must not have occurred[8]. (JGross_000038). Mr. Gross's opinion as to Walmart's alleged failure to conduct inspections is not an "expert opinion," but a conclusory statement of "fact" with no foundation. Mr. Gross readily admitted that he never spoke to any Walmart employees about their inspections or reviewed their deposition testimony surrounding same. (Doc. 26-2 at 14:16-19, 15:24 – 16:24, 133: 5-7). Yet in spite of these shortcomings, Mr. Gross purports to testify that Walmart did nothing to inspect its parking lot for potential hazards. In fact, the deposition testimony reveals that Walmart employees did, indeed, inspect the parking lot for hazards, and did so on the morning of Mrs. Morris's fall. (*See* Deposition of Loraine Mattice-Lowery; Doc. 26-6 at 26: 15-24, 27:20 – 28:14). Further, even if Mr. Gross had a legitimate source for his assumptions, determinations as to whether Walmart conducted inspections of their cart corrals to identify potentially hazardous situations, based on the testimony of Defendant's employees, is well within the ken of the average layperson.

###    3.    *Opinion 3: "Had Walmart conducted inspections . . . more likely than not they would have found the defective and potentially hazardous condition"*

Mr. Gross's opinion that "had Walmart conducted inspections, it's more likely than not that they would have found the hazardous condition at issue" not only assumes facts not in

---

[7]    Further, there is no evidence to suggest that Mr. Gross has specialized knowledge of or training from the National Cart Company.

[8]    This is another example of the "appeal to ignorance fallacy" in action. *See* Ali Almossawi, *An Illustrated Book of Bad Arguments*, p. 26 (2013).

evidence, but is entirely devoid of factual support and improperly speculates about what people

unknown to Mr. Gross should have seen. *See Hull v. Merck & Co., Inc.*, 758 F.2d 1474, 1477

(11th Cir. 1985) (per curiam) (finding speculative testimony to be "at odds with the purposes of

expert testimony as envisioned in Fed. R. Evid. 702."). When asked how Mr. Gross was able to

opine on what Walmart's employees would or would not have seen during an inspection of the

parking lot, Mr. Gross merely testified "[i]f you're looking for it, you're going to find [it].[9]" (*Id.*

at 136: 4-24). He then took his opinion one step further and testified:

> **Q:** So is it your testimony that you know what other people would see?
>
> **A:** **Absolutely, I know what they have the potential to see**, okay, unless you have some visually-impaired person that's going out there to look at this. Based on my experience and training hundreds of employees how to do inspections visually and tactually, they should be able to see this[10].

(*Id.* at 138: 8-15) (emphasis added). Despite claiming to know everything that a Walmart

employee would have seen during their inspection of the parking lot, to Walmart's

knowledge, Mr. Gross does not possess such superhuman powers. (Doc. 26-2 at 138: 8-

15).

Aside from Mr. Gross's opinion being purely speculative, Walmart had no duty or other

obligation to follow the **voluntary recommendations** of the cart corral manufacturer. *See*

*Bartenfeld v. Chick-fil-A, Inc.*, 346 Ga. App. 759, 764 (2018) (noting that voluntary standards or

guidelines do not constitute "express standards" requiring action thus failure to follow them does

---

[9]     If this Court were to apply Mr. Gross's same logic, then there is even more support for Defendant's summary judgment motion which is pending before this Court (Doc. 29). If the purported hazard was "so obvious" such that anyone with vision should have seen it, it therefore follows that Mrs. Morris should have also been alerted to it.

[10]     Although "*Daubert* does not require scientists to be endowed with superpowers," apparently Mr. Gross claims to be the exception to that general recognition. *325 Goodrich Ave., LLC v. Southwest Water Co.*, 891 F.Supp.2d 1364, 1381 (M.D. Ga. 2012) (citing *Fisher v. Ciba Specialty Claims*, No. 03-0566-WS-B, 2007 WL 2302470, at *8 (S.D.Ala. Aug. 8, 2007)).

not amount to a violation of any standard of care). The jury will hear the testimony of Walmart's corporate representative who testified that Walmart follows their internal policies and procedures for inspecting hazards in their parking lot, which includes their cart corrals, and that those internal policies and procedures include many of the same components of the National Cart Company's **voluntary** maintenance and inspection **recommendations**. (*See* 30(b)(6) Deposition of Joshua Maddox; Doc. 29-4 at 63:6 – 65:14).

### 4.    *Opinion 4: Determination of a trip hazard*

Lastly, Mr. Gross's opinion that "the base plate, **as photographed**, is a trip hazard" can be determined by the jury's own visual examination of the photographs of the base plate. Mr. Gross's sole source for determining the amount of space between the bottom of the metal base plate and the top of the pavement to conclude that a hazard existed was him personally looking at a photograph of the base plate with a yard stick held up to it and reading the centimeter notches on the yardstick. (Doc. 26-8 at JGross_000037). A jury can likewise look at a photograph and count the number of centimeter notches between the base plate and pavement without Mr. Gross's assistance.

Just as the Court in *Abrams* held that the determination of whether a post that protruded into a walkway amounted to a safety hazard was a commonly known and observable matter well within the jury's ken, so too is the determination of whether a metal base plate at the entrance of a cart corral amounts to a trip hazard. Mr. Gross's "stamp of approval" on Plaintiffs' contention does nothing to advance a material aspect of Plaintiffs' claims, thereby rendering it irrelevant. *See Dukes v. Georgia*, 428 F.Supp.2d 1298, 1315 (N.D. Ga. 2006).

**B.**     **Jeffrey Gross's Opinions Are Unreliable and are Not the Product of Sound Methodology**

With regard to the reliability requirement, a trial court must assess whether the reasoning, technique, and/or methodology underlying the expert's testimony is valid, and whether it is proper to apply the methodology to the particular facts at issue. *Frazier*, 387 F.3d at 1262. The Court "must examine the methodology supporting each expert's opinion step-by-step. If the chain of reliability is broken at one step, then the Court should not admit the expert's opinion . . ." *J &V Development*, 387 F.Supp.2d 1214, 1224 (M.D. Ga. 2005).

**1.**     *Mr. Gross's methodology is unreliable and contradictory*

Mr. Gross's methodology consisted of looking at a photograph taken by an unknown individual who held a yardstick up to a metal base plate, **on an unknown date**, at an unconfirmed location and "adding an inch overlay in the picture which more clearly depicts the measurements." (Doc. 26-8 at JGross_000037). To arrive at his conclusion that the total height from the surface of the parking lot to the bottom of the base plate is 3/8th of an inch, Mr. Gross did not measure the thickness of the baseplate, but instead **assumed** that Walmart's base plate was the same thickness as a base plate Mr. Gross inspected on another occasion at a **Kroger** store, because he had not seen any evidence to the contrary that Walmart's base plate was not a quarter inch thick. (Doc 26-2. at 120:12-22). After reviewing only unsubstantiated photographs of the base plate, Mr. Gross then concluded that the base plate amounted to a trip hazard.  (Doc. 26-8 at JGross_000038). However, Mr. Gross readily admitted that he did not know if the photograph he was provided even represents the actual base plate that Mrs. Morris tripped over. (Doc. 26-2 at 93: 11-13).

Mr. Gross, himself, even appears to be skeptical of the methodology he used in this case. In a similar case pending in the State Court of Gwinnett County (*Skocic v. Retail Properties*,

17

Civil Action No. 18-C-03130-S6), Mr. Gross was retained by Plaintiff's counsel to conduct an inspection of a purported hazard in the parking lot of a Subway restaurant. (*See* September 14, 2020 Affidavit of Jeffrey Gross; Exhibit "B"). Just like in Mrs. Morris's case, in *Skocic*, Mr. Gross planned to use measurements to determine whether the parking lot hazard amounted to an "abrupt change in elevation in the walking surface exceeding 1/4 inch" in violation of the ASTM, ADA, and International Building Code. (*Id*. at ¶ 10). Another striking similarity – Mr. Gross learned that the hazard in *Skocic* had been removed before he had a chance to inspect it, leaving him instead with several photographs which depicted the hazard as it existed on the date of incident. (*Id*. at ¶ 11). That is where the similarities in *Skocic* and Mrs. Morris's case end. Unlike Mrs. Morris's case where Mr. Gross has opined that he did not need to physically inspect the hazard and was instead able to conclude that the base plate is a trip hazard based solely on photographs from Plaintiffs' counsel, in *Skocic*, despite having the same photographs, Mr. Gross submitted a sworn affidavit stating it was "**impossible for [him] to conduct any type of methodology for documenting a potential trip hazard and/or irregular walking surface**" using only the photographs provided to him by Plaintiff's counsel. (*Id*. at ¶ 12). This astounding contradiction alone effectively illustrates the meaning of a "hired gun" opinion and renders Mr. Gross' "methodology" unreliable.

### 2. *Mr. Gross's determination of a trip hazard is unsupported by objective evidence, including the "standards" he cites to*

Mr. Gross's opinion that the metal base plate amounts to a trip hazard is based on "the standards derived from the American Society of Testing and Materials (ASTM) Standard Practice for Safe Walking Surfaces, as well as the National Fire Prevention Association Means of Egress Section, the International Building Code, and American With Disabilities Act, which Mr. Gross contends "all recognize that abrupt changes in the elevation of the walking surface

which exceed 1/4 of an inch are not permissible and must be treated in a fashion that allows it to be beveled to a geometry of 1 and 2 rise run [which] did not occur in [this case]." (Doc. 26-8 at JGross_000038). Using his unreliable and contradictory methodology of reviewing photographs and failing to account for discrepancies in the actual thickness of the base plate at issue and the ruler used by individual who took the photograph, Mr. Gross concluded that Walmart has "violated" the ASTM standard on safe walkway surfaces. (Doc. 26-2 at 127: 11-14).

There are several problems with Mr. Gross's "supporting standards." First, as the Georgia Court of Appeals noted in *Bartenfeld*, the ASTM's own website expressly states, "ASTM standards are voluntary in that we do not mandate their use." 346 Ga. App. at 764; *see also* https://www.astm.org/ABOUT/faqs.html (last visited February 11, 2021), attached as Exhibit "C" at p. 1. Additionally, the ASTM does not address shopping cart corrals, or anything remotely of that nature. (Doc. 26-2 at 124: 15-18; *see also* Doc. 26-8 at pp. 20-22). However, Mr. Gross grasped at straws to stretch the applicability of the voluntary ASTM standards to this case:

> **Q:** . . . my understanding is, in this case . . . you were not testifying as to any standard of care; correct?
>
> **A:** I am not testifying to a standard of care. What I'm testifying to is that as early as 1995, ASTM created the standards for safe walking services, which, **I believe**, is applicable in this case, to help protect the public against trip hazards. . . **had this been inside the building,** it would have been a violation of the - - of the code in Georgia. That it happens to be outside the building does not change any type of environmental impact or physical attributes.

(Doc. 26-2 at 126: 5-21) (emphasis added).

As for the International Building Code which Mr. Gross cited to in his expert report, Mr. Gross conceded that it did not apply to a parking lot cart corral and that he simply mentioned it to somehow "show the legitimacy of the standard[.]" (*Id*. at 142: 8-17). Lastly, while Mr. Gross's fourth opinion states that the base plate at issue violates the ASTM and International Building

Code which recognize that abrupt changes in elevation of walking surfaces which exceed 1/4 of an inch are impermissible, these "standards" only apply to "**means of egress**" and Mr. Gross admitted that cart corrals do not qualify as a "means of egress":

> **Q:**   Now isn't it true that a cart corral that's over 75 feet from the store's exit doors wouldn't be considered part of the means of egress per the NFPA definition?
>
> **A:**   **You're absolutely right**. And I have never made any representation that it has…

(Doc. 29-1; Doc. 26-2 at 143:24 – 144:25) (emphasis added).

Lastly, the ADA section Mr. Gross relied upon to support his opinions, Section 303, only applies to "**accessible routes**." As with the inapplicability of the ASTM and International Building Code, Mr. Gross conceded that the ADA does not apply to shopping cart corrals:

> **Q:**   [I]sn't it true that section 303 is only cited in the ADA as a requirement for accessible route, bathrooms, and boat ramps?
>
> **A:**   **That's absolutely right**. And again, as I've said before, I'm showing the legitimacy and appropriateness of this standard to be used . . .

. . .

> **Q:**   Is a cart corral required by the ADA to be an accessible route?
>
> **A:**   **No.**

(*Id*. at 146: 7-15, 149: 4-6) (emphasis added).

As such, Mr. Gross's opinion regarding Walmart's base plate having an impermissibly unsafe walking surface exceeding 1/4 of an inch for its failure to be beveled to a geometry of 1 and 2 rise and run and his subsequent conclusion that as a result, the base plate amounts to a trip hazard, are unreliable and unsupported by the very "standards" and documents offered by Mr. Gross.

## **CONCLUSION**

Mr. Gross's opinions ignore any real vestige of the reliability required under *Daubert*. As our courts have long recognized, expert opinions hold a special weight and sway with lay jurors. What this means in practice, and here, is that this Court must closely guard its gates and prevent the "expert" opinions of Mr. Gross which fall drastically short of meeting the requirements of *Daubert* and Federal Rule of Evidence 702.

Respectfully submitted, this 11th day of February, 2021.

**DREW ECKL & FARNHAM, LLP**

*/s/ Elissa B. Haynes*
Michael L. Miller
Georgia Bar No. 508011
Elissa B. Haynes
Georgia Bar No. 804466
*Attorneys for Defendants*

303 Peachtree Street NE
Suite 3500
Atlanta, Georgia 30308
404-885-1400
404-876-0992 (fax)
millerm@deflaw.com
haynese@deflaw.com

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION**

| | |
|---|---|
| CONNIE JO MORRIS and JOHNNY MORRIS, | |
|      PLAINTIFFS, | |
| v. | CIVIL ACTION FILE NO.: |
| WAL-MART STORES EAST, LP; WAL-MART STORES EAST, LP, D/B/A WAL-MART SUPERCENTER #593; WALMART INC F/K/A WAL-MART STORES, INC., | 5:20-cv-00032-LGW-BWC |
|      DEFENDANTS. | |

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served all parties in this case with **DEFENDANTS' DAUBERT MOTION TO EXCLUDE TESTIMONY OF JEFFREY GROSS AND BRIEF IN SUPPORT THEREOF** in accordance with the directives from the Court Notice of Electronic Filing ("NEF"), which was generated as a result of electronic filing.

John Andrew Tanner, Jr.
Farrar, Hennesy & Tanner, LLC
P.O. Box 770 (31534)
316 Madison Avenue North
Douglas, Georgia 31533
drew@fhtlawyers.com

Respectfully submitted, this 11th day of February, 2021.

**DREW ECKL & FARNHAM, LLP**

*/s/ Elissa B. Haynes*
Michael L. Miller
Georgia Bar No. 508011
Elissa B. Haynes
Georgia Bar No. 804466
*Attorneys for Defendants*

303 Peachtree Street, N.E.
Suite 3500
Atlanta, Georgia 30308
(404) 885-1400
(404) 876-0992 (fax)
millerm@deflaw.com
haynese@deflaw.com